UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

PETER MOESCHLER,                                    Case No. 21-CV-0416 (PJS/DTS)

      Plaintiff/Counter-Defendant,

v.

HONKAMP KRUEGER FINANCIAL
SERVICES, INC., and BCOR
ADMINISTRATIVE SERVICES, LLC,

                                      ORDER

      Defendants/Third-Party Plaintiffs/
      Counter-Claimants,

v.

MARINER, LLC, d/b/a Mariner Wealth
Advisors,

      Third-Party Defendant.

Katie M. Connolly, Andrew Peterson, and Joel D. O'Malley, NILAN
JOHNSON LEWIS PA, for Peter Moeschler and Mariner, LLC.

Jeremy D. Sosna, Benjamin D. Sandahl, Lauren Clements, and Michael R.
Link, LITTLER MENDELSON P.C., for Honkamp Krueger Financial
Services, Inc., and BCOR Administrative Services, LLC.

Peter Moeschler is a former employee of Honkamp Krueger Financial Services,

Inc. ("HKFS"). Moeschler resigned on February 12, 2021, and—that same day—filed

this lawsuit seeking a declaratory judgment that the restrictive covenants in his

employment agreements with HKFS are unenforceable. Almost immediately after

filing suit, Moeschler began working for Mariner, LLC, a direct competitor of HKFS.[1]

HKFS filed counterclaims against Moeschler and third-party claims against Mariner

alleging breach of contract, violation of Iowa's Uniform Trade Secrets Act, and tortious

interference with contractual relations.  This matter is now before the Court on HKFS's

motion for a preliminary injunction.  For the reasons that follow, the motion is denied.

## I.  BACKGROUND

HKFS is a wealth-management company that partners with CPA firms to offer

financial-planning services to the CPA firms' clients.  ECF No. 13 ¶¶ 3–4.  Moeschler

was employed by HKFS as a financial advisor between 2003 and 2011.  Moeschler

returned to HKFS as a client-development specialist in June 2015.  ECF No. 1 ¶ 16.

Moeschler signed two agreements upon his return: an Agreement Ancillary to

Employment ("Agreement Ancillary") and an Employee Proprietary Information

Agreement ("EPIA").  The Agreement Ancillary includes nonsolicitation and

confidentiality provisions but does not include a noncompetition provision.  ECF

No. 1-1.  The EPIA restricts Moeschler's use and disclosure of HKFS's trade secrets and

confidential information.  ECF No. 1-2.

---

[1]This lawsuit is one in a series of lawsuits involving HKFS, on the one hand, and
Mariner and former HKFS employees who now work for Mariner, on the other hand.
*See Fulton v. Honkamp Krueger Fin. Servs., Inc.*, No. 20-CV-1063 (PJS/DTS), 2020 WL
7041766 (D. Minn. Dec. 1, 2020); *Miller v. Honkamp Krueger Fin. Servs., Inc.*, No. 5:20-CV-
05056-KES, 2020 WL 6707204 (D.S.D. Nov. 13, 2020), *rev'd*, Nos. 20-3061, 20-3081, 20-
3400, 2021 WL 3729047 (8th Cir. Aug. 24, 2021); *Honkamp Krueger Fin. Servs., Inc. v.
Anderson*, No. 01311 LACV111223 (Iowa Dist. Ct. Jan. 10, 2021).

In April 2019, Moeschler was promoted to client-development manager. ECF No. 9 (Answer) ¶ 16. In that capacity, Moeschler was responsible both for advising clients and for managing and developing relationships with CPA firms. *Id.* Moeschler signed a second EPIA a few months after his promotion, but he was not asked to sign any other agreements. *See* ECF No. 1-3. The Agreement Ancillary and the EPIAs are governed by Iowa law.

HKFS was acquired by Blucora, Inc., on July 1, 2020. ECF No. 9 (Answer) ¶ 5. Six months later, on January 1, 2021, Moeschler became an employee of BCOR Administrative Services, LLC ("BCOR"), an affiliate of Blucora. *Id.* ¶ 7. On February 12, 2021, Moeschler terminated his employment with BCOR. ECF No. 13-1 at 15. About an hour later, Moeschler filed this lawsuit against HKFS and BCOR seeking a declaration that the Agreement Ancillary and the EPIAs are unenforceable to the extent that they prohibit him from working for Mariner or from soliciting HKFS's clients or CPA affiliates.[2]

On the day that he resigned, Moeschler retained a forensic expert to image his cell phone and laptop and deleted all business-related contacts on his cell phone. ECF No. 19 ¶ 5. Moeschler alleges that he then used publicly available information to look up contact information for HKFS clients and CPA firms whose names he remembered.

_____

[2]HKFS (now known as Avantax Planning Partners, Inc.) asserts that it "remains a fully intact, operational corporate entity" following the acquisition. ECF No. 21 at 7; ECF No. 13-2 at 2, 11.

Moeschler also called a few clients whose phone numbers he had committed to memory. Some of those clients gave Moeschler contact information for their family members, who were also HKFS clients. And finally, some HKFS clients and CPA firms reached out to Moeschler on their own initiative after he left HKFS. ECF No. 19 ¶¶ 6–7. According to HKFS, clients with a total of $11 million of assets under management have followed Moeschler to Mariner. ECF No. 13 ¶ 31.

In this lawsuit, HKFS alleges that Moeschler has breached the non-solicitation and confidentiality clauses of his Agreement Ancillary, that he has used and disclosed trade secrets and confidential information in violation of the EPIAs, and that both Moeschler and Mariner have violated the Iowa Uniform Trade Secrets Act. HKFS further alleges that Mariner tortiously interfered with both the Agreement Ancillary and the EPIAs. HKFS now seeks a preliminary injunction enjoining Moeschler and Mariner from continued breaches, statutory violations, and tortious acts.

## II. ANALYSIS

### A. Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A litigant seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *see*

*also Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

HKFS, as the movant, "'bears the burden of proving' that these factors weigh in its

favor." *Mgmt. Registry, Inc. v. A.W. Cos.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (quoting

*Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

### B.  Likelihood of Success

"In considering the likelihood of the movant prevailing on the merits, a court

does not decide whether the movant will ultimately win," *PCTV Gold, Inc. v. SpeedNet,*

*LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007), but instead decides whether the movant has

established, at minimum, a "fair ground for litigation," *Watkins*, 346 F.3d at 844 (quoting

*Loveridge v. Pendleton Wollen Mills, Inc.*, 788 F.2d 914, 916 (2d Cir. 1986)).  The Court

finds that HKFS has established a likelihood of success with respect to its claims that

Moeschler breached and that Mariner tortiously interfered with the EPIAs but has not

established a likelihood of success with respect to its other claims.

### 1.  Breach of Nonsolicitation Clause

HKFS alleges that Moeschler breached the nonsolicitation clause of the

Agreement Ancillary by contacting HKFS's clients and by soliciting and accepting

business from those clients on Mariner's behalf.  As evidence of Moeschler's breach,

HKFS points to the $11 million in assets under management that it has lost to Mariner

since Moeschler's resignation and to a February 23, 2021, email exchange between

HKFS and Camille Richards (a former HKFS client).  ECF No. 13 ¶ 31.  A week after

Moeschler resigned, an HKFS financial advisor emailed Richards to introduce himself as the new point person on her account.  ECF No. 13-2 at 11.  Richards responded that she had decided to partner with another firm, and HKFS subsequently learned that Richards had moved her business to Mariner.

HKFS alleges that these facts establish that Moeschler breached the client-nonsolicitation clause of the Agreement Ancillary, which provides that:

> During Employee's employment and for a period of three years after [he] ceases to be employed by Employer, Employee shall not, directly or indirectly, solicit or divert business from, accept business from, provide, or attempt to convert to other methods of using, the same or similar products or services provided by Employer either before or after the date hereof by Employer, including clients with respect to whom Employee performed professional services prior to [his] employment with Employer.  For purposes of this section, any client or account of Employer includes, but is not limited to, any person or entity to whom Employer provided service(s) within the twenty-four (24) month period prior to Employee's employment termination.

ECF No. 1-1 at 3.

Moeschler argues that HKFS cannot establish a likelihood of success on this claim because the nonsolicitation clause is unintelligible.  The Court agrees.

The clause begins promisingly enough:  Moeschler is prohibited from taking various actions for three years.  He cannot solicit, divert business from, accept business from, provide, or attempt to convert to other methods of using—something.  But what? The phrase that follows this list of verbs is "the same or similar products or services."

But that makes no sense; Moeschler cannot solicit or divert or accept business from products or services.

It appears that the drafter meant "the same or similar products or services" to be paired with the two verbs that immediately precede it ("provide, or attempt to convert to other methods of using") and the words that immediately follow it ("provided by Employer either before or after the date hereof by Employer").  On this reading, Moeschler is forbidden to: (1) "solicit"; (2) "divert business from"; (3) "accept business from"; or (4) "provide, or attempt to convert to other methods of using, the same or similar products or services provided by Employer either before or after the date hereof by Employer."  The last clause is still a mess—"by Employer" appears twice—but let's ignore the second "by Employer."  We still need an *object*.  Solicit *whom*?  Divert business from *whom*?  Accept business from *whom*?  Provide products or services to *whom*?  Convert *whom* to other methods?

The next words following this list of verbs make up a modifying clause: "including clients with respect to whom Employee performed professional services prior to [his] employment with Employer."  But like the verbs, this modifying clause is an orphan.  It is intended to clarify that *something* includes certain clients, but it does not say what.

Perhaps the word "including" is the problem  If the Court were to ignore the word "including"—as it ignored the duplicate phrase "by Employer"—Moeschler

would be prohibited from soliciting, diverting or accepting business from, or providing

products or services to clients with whom he worked before he was employed by

HKFS, but not clients with whom he worked during his employment at HKFS.  That

also would make no sense.  Indeed, such a clause would likely be unenforceable.  *See*

*Lamp v. Am. Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986) (holding that restrictive

covenants are enforceable where, among other requirements, the restriction is

"reasonably necessary for the protection of the employer's business").

At oral argument (though not in its briefing), HKFS argued that the drafting of

the nonsolicitation clause is not fatally deficient, as the Court can fix most (but not all)

of the problems if the Court would just insert a phrase like "any client of HKFS" before

"including clients."  But the meaning of the term "client," as that term is used by HKFS

in its restrictive covenants, is hotly contested in this and other pending lawsuits

involving HKFS and Mariner.[3]  In other words, HKFS is not asking the court to fix its

drafting by correcting a typo or inserting an article or deleting an errant comma; it is

asking the Court to supply a crucial term that does not have an agreed-upon definition.

The Court would be loathe to go so far to fix *any* contractual provision, much less a

restrictive covenant—which, under Iowa law, is disfavored as a restraint on trade and

must be strictly construed against the employer.  *See Ag Spectrum Co. v. Elder*,

---

[3]*See Miller*, 2020 WL 6707204, at *1–2, 6–8; *Fulton v. Honkamp Krueger Fin. Servs., Inc.*, No. 20-CV-1063 (PJS/DTS), 2020 WL 7041766, at *10 (D. Minn. Dec. 1, 2020).

191 F. Supp. 3d 966, 971 (S.D. Iowa 2016), *aff'd*, 865 F.3d 1088 (8th Cir. 2017); *Fulton v.*

*Honkamp Krueger Fin. Servs., Inc.*, No. 20-CV-1063 (PJS/DTS), 2020 WL 7041766,

at *2 & n.4 (D. Minn. Dec. 1, 2020).

HKFS points out that, under Iowa law, restrictive covenants that are deemed

overbroad are nonetheless enforced by courts to the extent that they are reasonable.

*See Lamp*, 379 N.W.2d at 910; *see also Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224,

1262 (N.D. Iowa 1995). That is true, but the problem with Moeschler's nonsolicitation

clause is not that it is overbroad. The problem is that it is gibberish. HKFS is not asking

the Court to narrow the scope of a clear provision; HKFS is asking the Court to save an

unintelligible provision by inserting crucial terms that HKFS omitted.

The bottom line is that, due to HKFS's abysmal drafting, the nonsolicitation

clause that appears in Moeschler's agreement does not prohibit him from soliciting

anyone. Thus, the Court cannot find that HKFS has a likelihood of success with respect

to its claim that Moeschler has breached that clause.

### 2. Trade Secrets and Confidential Information

HKFS next alleges that Moeschler is using and disclosing its trade secrets and

confidential information in violation of (1) the Iowa Uniform Trade Secrets Act, Iowa

Code §§ 550.1–550.8, (2) the confidentiality clause of the Agreement Ancillary, and

(3) the EPIAs. The evidence in support of HKFS's allegation is scant. There is no

evidence that Moeschler retained or removed any trade secret or confidential

information in either hard copy or electronic form when he left HKFS.  To the contrary,

Moeschler has submitted an affidavit stating that he deleted all business contacts from

his cell phone at the time of his resignation and that he hired a forensic expert to ensure

that he did not have any other protected information on his personal devices.  ECF

No. 19 ¶ 5.  Thus, the only trade secrets and confidential information at issue—at least

for purposes of the pending motion—are the trade secrets and confidential information

that are present in Moeschler's memory.

HKFS nonetheless argues that the evidence is sufficient to establish a likelihood

of success on its trade-secret and confidentiality claims.  Specifically, HKFS points to

(1) Moeschler's admission that he contacted HKFS's clients and CPA affiliates following

his departure and (2) the fact that at least $11 million in assets under management have

moved from HKFS to Mariner since Moeschler's resignation (including the assets of

Camille Richards).  HKFS argues that the names and contact information of its clients

and of the CPA firms with which it works are protected trade secrets and confidential

information, even if Moeschler has them only in his memory.

### a.  Iowa Uniform Trade Secrets Act

A "trade secret" protected by the Iowa Uniform Trade Secrets Act is broadly

defined as "information, including but not limited to a formula, pattern, compilation,

program, device, method, technique, or process" that "[d]erives independent economic

value, actual or potential, from not being generally known to, and not being readily

ascertainable by proper means by a person able to obtain economic value from its disclosure or use" and that is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Iowa Code § 550.2(4). Moeschler and Mariner contend, however, that Iowa courts have interpreted the Act to exclude information that an employee or former employee possesses exclusively in his memory. Moeschler and Mariner seem to be correct.

In *Lemmon v. Hendrickson*, 559 N.W.2d 278, 280 (Iowa 1997), the Iowa Supreme Court considered whether a customer list that a former employee retains in his memory "is afforded protection as a trade secret under common law." Gayle Lemmon, owner of Do–Rite Pest Control Company, filed suit after a former employee started a competing company (Revenge Pest Control) following the expiration of his two-year non-compete agreement. Revenge took seven of Do–Rite's former customers, and Lemmon alleged that the loss of those customers proved that the former employee had misappropriated Do–Rite's customer list. The former employee testified that "he remembered the names of some former customers and solicited from that recollection." *Id.* But, as in this case, there was no evidence that the former employee retained a written or electronic copy of the customer list when he left Do–Rite.

The Iowa Supreme Court held that soliciting customers from memory does not constitute misappropriation of trade secrets. Citing the Second Restatement of Agency, the court explained that the former employee had a duty "not to use or to disclose . . .

-11-

trade secrets, written lists of names, or other similar confidential matters" but that the employee was "entitled to use general information concerning the method of business . . . *and the names of the customers retained in his memory*." *Id.* at 280–81 (citation omitted). Because there was "no evidence that the attainment of seven of Do–Rite's customers was a product of anything else than [the former employee]'s utilizing his recollection of those people who had a need for pest control," the court found that he had not misappropriated any trade secret protected at common law.

It is unclear whether the Iowa Supreme Court intended to limit its holding to common-law claims for misappropriation of trade secrets or whether the court intended to extend its holding to statutory claims as well.[4] But the Iowa Court of Appeals has consistently applied *Lemmon*'s holding to claims under the Iowa Uniform Trade Secrets Act. *See Kenyon & Landon, Inc. v. Bus. Letter, Inc.*, No. 01-1386, 2002 WL 31309700, at *3

---

[4]The *Lemmon* court referred to the Iowa Uniform Trade Secrets Act twice, but both references occurred in the course of the court's analysis of whether the former employee misappropriated Lemmon's design for a bird pole. *See* 559 N.W.2d at 279 ("The parties disagree over whether the bird pole sufficiently constitutes a trade secret such that it falls within the statutory and common law protection."); *id.* at 280 ("Lemmon correctly notes that section 550.3(1) of the Iowa Code empowers a court to award an injunction for 'actual or threatened misappropriation' of a trade secret."). With respect to Lemmon's claim that the former employee misappropriated her customer list, the court said that the claim arose under the common law and the parties' agreement and said nothing about the Iowa Uniform Trade Secrets Act. *See id.* ("Lemmon further alleges that Revenge has impermissibly used Do–Rite's customer list to solicit new business. This claim is based both on an assertion that Do–Rite's customer list should be protected under the common law as a trade secret and that the employment agreement . . . prohibits the disclosure of the list to competitors.").

-12-

(Iowa Ct. App. Oct. 16, 2002) (finding that substantial evidence supported jury's finding that defendant had not misappropriated trade secrets in violation of the Iowa Uniform Trade Secrets Act where the defendant "had visited his former . . . customers by virtue of his recollection of who they were" and had not removed "hard copies of anything" when he quit); *Educ. Tech., Ltd. v. Meinhard*, No. 99-0689, 2001 WL 488088, at *5 (Iowa Ct. App. May 9, 2001) (citing *Lemmon* and affirming directed verdict for defendants on claim under Iowa Uniform Trade Secrets Act because "the law recognizes the fact [that], at the termination of a business relationship, an agent retains in his memory and can properly utilize certain business information in competition with his former principal," including "the names of the customers retained in his memory").

HKFS argues that, even if the names and contact information that Moeschler has in his memory are not trade secrets protected by the Iowa Uniform Trade Secrets Act, HKFS has nonetheless demonstrated a likelihood of success on its statutory claim because Moeschler also used other protected information, such as the knowledge that a particular client is associated with a particular CPA firm, has a particular net worth, or has a certain amount of assets under management.  HKFS points to no evidence that its allegations are true save for the fact that some clients followed Moeschler to Mariner. This, says HKFS, means that Moeschler *must* have used other trade secrets and confidential information.

There are several problems with HKFS's argument:

First, HKFS's conclusion does not follow from its premise.  It is entirely possible—perhaps even likely—that some of Moeschler's clients followed him to Mariner on their own initiative simply because they thought that he had done a good job for them and they wanted to continue to work with him.  The fact that a client followed Moeschler to Mariner is not proof that Moeschler misappropriated any trade secrets or confidential information.

Second, the confidentiality provisions in Moeschler's agreements have no temporal limitation.  Thus, if evidence that a client followed Moeschler to Mariner is evidence that he *necessarily* breached a confidentiality clause, then, as a practical matter, HKFS would be converting a confidentiality clause into a perpetual nonsolicitation, nonacceptance, and (partial) noncompete clause.  Moeschler would *never* be able to provide services to a former client—because, on HKFS's view, it is impossible for Moeschler to provide services to a former client without using trade secrets or confidential information.

Finally, *Lemmon*'s carve-out for client information stored solely in a former employee's memory is not as narrow as HKFS suggests.  In *Lemmon*, as in this case, the plaintiff's sole evidence in support of her trade-secrets claim was the loss of clients to her former employee.  But the Iowa Supreme Court held that the former employee had not misappropriated trade secrets by using "general information concerning the method

-14-

of business" or by "utilizing his recollection of those people who had a need for pest control." *Lemmon*, 559 N.W.2d at 281.  Similarly, the fact that Moeschler "utilized his recollection" not just of his clients' names and contact information but also of the fact that they "had a need for" financial-management services does not mean that he misappropriated trade secrets.[5]

Because it does not appear based on the record currently before the Court that Moeschler has used or disclosed HKFS's "trade secrets"—as that term is defined at

---

[5]HKFS also accuses Moeschler of violating the Iowa Uniform Trade Secrets Act by using and disclosing information about HKFS's products and services, pricing strategies and referral fees, business methods, future business plans, marketing strategies, databases, organization, and financial and accounting measures.  These factual allegations are without record support, and HKFS's allegation that Moeschler and Mariner misappropriated such information is too speculative to support a preliminary injunction.

HKFS urges the Court to find a likelihood of success based on a theory of threatened or "inevitable" disclosure, given that Moeschler is now working for a direct competitor.  ECF No. 12 at 26.  Again, though, HKFS is trying to convert a confidentiality clause into a de facto (and indefinite) noncompetition clause.  If HKFS wanted to prohibit Moeschler from working for a competitor, HKFS could have included a noncompetition clause in his employment agreements.  It did not.  In any event, courts have declined to apply the doctrine of inevitable disclosure where, as here, there is no evidence that the former employee took any information in paper or electronic form.  *See Barilla Am., Inc. v. Wright*, No. 4-02-CV-90267, 2002 WL 31165069, at *10–11 (S.D. Iowa July 5, 2002) (holding that plaintiff could not prevail on theory of inevitable or threatened disclosure with respect to the trade secrets former employee stored in his memory but was entitled to preliminary injunction based on the extensive "evidence of trade secret information that [the employee] took with him" in electronic form); *see also Honeywell Int'l Inc. v. Stacey*, No. 13-CV-3056 (PJS/JJK), 2013 WL 9851104, at *6 (D. Minn. Dec. 11, 2013) (finding plaintiff unlikely to succeed on inevitable-disclosure theory because "this is not a case in which a departing employee stole documents or other tangible matter that contained alleged trade secrets").

Iowa Code § 550.2(4) and interpreted by Iowa courts—HKFS has failed to establish a likelihood of success on its trade-secrets claim.

*b. Agreement Ancillary*

The fact that certain information is not protected under the Iowa Uniform Trade Secrets Act does not mean that the information is not protected by contract. Indeed, in *Lemmon*, after the Iowa Supreme Court concluded that the customer information was not protected at common law, the court went on to analyze whether the same information was protected by contract. 559 N.W.2d at 281–82. In this case, HKFS's confidential information is protected by three contracts: the Agreement Ancillary and the two EPIAs.

The confidentiality clause of the Agreement Ancillary provides, in relevant part:

> Employee covenants and agrees that [he] will not, at any time during or following the term of [his] employment, directly or indirectly, divulge or disclose for any purpose whatsoever any "confidential information" that has been obtained by or disclosed to [him] as a result of [his] employment . . . by Employer.

ECF No. 1-1 at 2. Importantly, this clause prohibits Moeschler from divulging or disclosing confidential information, but it does not prohibit Moeschler from *using* confidential information. As HKFS has not cited any evidence that Moeschler has divulged or disclosed any of its confidential information, HKFS has not established a

-16-

likelihood of success on its claim that Moeschler breached the confidentiality clause of

the Agreement Ancillary.

*c.  EPIAs*

HKFS has, however, established a likelihood of success on its claim that

Moeschler breached the EPIAs.  Both EPIAs provide:

> I agree to keep confidential . . . and not to disclose, or *make*
> *any use of* except from [sic] the benefit of the Company, at
> any time either during or subsequent to my employment,
> any trade secrets, confidential information, . . . or any subject
> matter pertaining to any business of the Company or any of
> its clients, licensees, or affiliates, which I may produce,
> obtain, or otherwise acquire during the course of my
> employment, except as herein provided.  I further agree not
> to deliver, reproduce, or in any way allow any such trade
> secrets, confidential information, knowledge, data, or other
> information . . . relating thereto, to be delivered or used by
> any third parties without specific direction or consent of a
> duly authorized representative of the Company.

ECF No. 1-2 at 1; ECF No. 1-3 at 2 (emphasis added).

Unlike the confidentiality clause of the Agreement Ancillary, the EPIAs prohibit

both the disclosure and use of confidential information.  Further, the names and contact

information of HKFS clients and CPA affiliates—which Moeschler has admitted to

using—seem to be protected under the broad language of the EPIAs.

Moeschler does not seriously argue that these facts are insufficient to establish a

breach of the EPIAs.  Instead, Moeschler argues that the EPIAs are unenforceable

because the burden they place on his postemployment activities dwarfs any legitimate

interest that HKFS has in protecting the names and contact information of its clients and the CPA firms with which it works.  At oral argument, Moeschler argued that if HKFS seeks to wield the EPIAs in this manner—that is, as a de facto nonsolicitation clause— the EPIAs should be subject to the same "reasonableness" limitations as explicit nonsolicitation clauses.  *See Lamp*, 379 N.W.2d at 910 (Iowa 1986) (restrictive covenants are enforceable only if they are "reasonably necessary for the protection of the employer's business" and not "unreasonably restrictive of the employee's rights"); *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983) (Iowa courts "apply a reasonableness standard in maintaining a proper balance between the interests of the employer and the employee").  Here, the EPIAs restrict Moeschler's use of confidential information forever—regardless of his position or where in the world he is working.  Because these restrictions on Moeschler's post-employment behavior are (according to Moeschler) grossly overbroad, Moeschler argues that the Court should declare them invalid.

But that is not the way that Iowa law works.  Under Iowa law, courts do not declare overbroad restrictive covenants invalid and decline to enforce them at all; instead, courts enforce overbroad restrictive covenants to the extent that they are reasonable.  *See Lamp*, 379 N.W.2d at 910 (if a restrictive covenant "is void only because it is too broad, a court in the interest of justice should require enforcement of it to the extent that it is not overbroad").  In other words, courts look at the particular conduct

that the former employer challenges and ask whether it is reasonable to apply the overbroad restrictive covenant to that conduct.

Although the question is not free from doubt, the Court concludes that is reasonable for HKFS to forbid Moeschler from using the names and contact information of its clients and CPA affiliates in the service of a direct competitor in the months that immediately follow his resignation.  Moeschler's position as a senior financial advisor with Mariner is similar to his former position with HKFS, and Moeschler is working in the same, relatively small metropolitan area (Rochester, Minnesota).  ECF No. 9 (Counterclaim and Third-Party Claim) at ¶¶ 9, 52.  Because the EPIAs' restriction on Moeschler's ability to use confidential information appears to be reasonable as applied, the Court finds that HKFS has demonstrated a likelihood of success on this claim.

### 3.  Tortious Interference

Finally, HKFS alleges that Mariner has tortiously interfered with both the Agreement Ancillary and the EPIAs.  "Under Minnesota law, a claim of tortious interference with contractual relations requires that [the plaintiff] show: '(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.'"[6]

---

[6]The parties agree that Minnesota law governs the tortious-interference claim. *See* ECF No. 12 at 23; ECF No. 18 at 27–28.

*E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 664 (8th Cir. 2012) (quoting *Furlev*

*Sales & Assocs. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982)).

The Court has found that HKFS has established a likelihood of success on its

claim that Moeschler breached the EPIAs (but not on its claim that Moeschler breached

the Agreement Ancillary). Mariner does not dispute for purposes of this motion that it

was aware of the EPIAs and that—if it *did* interfere with those contracts—there was no

justification for its actions. Mariner does argue, however, that HKFS is unlikely to be

able to establish that Mariner intentionally procured Moeschler's breach of the EPIAs.

Mariner points out that, to succeed on a claim for tortious interference with

contractual relations under Minnesota law, HKFS must prove that Mariner intentionally

induced or procured the breach; it is not enough that Mariner benefitted from the

breach. *See E-Shops*, 678 F.3d at 664–65; *Sip-Top, Inc. v. Ekco Grp.*, 86 F.3d 827, 832 (8th

Cir. 1996). "Phrased in more generic tort law terms, this means the plaintiff must prove

that the defendant *caused* the breaching party to breach its contract." *Quest Commc'ns*

*Co. v. Free Conferencing Corp.*, 905 F.3d 1068, 1074 (8th Cir. 2018); *see also United Wild Rice,*

*Inc. v. Nelson*, 313 N.W.2d 628, 632 (Minn. 1982) ("In an action for tortious interference

with contractual relations, the plaintiff carries the burden of proving that interference

was caused by the defendant.").

Here, HKFS alleges that Moeschler breached the EPIAs when he contacted

HKFS's clients and CPA affiliates and told them (at a minimum) that he was leaving

-20-

HKFS and going to work for Mariner, leading to HKFS's loss of $11 million in assets

under management.  Discovery may well prove that Moeschler acted independently

from Mariner in making those contacts and that Mariner did not direct or encourage

Moeschler to breach the EPIAs.  But, at this early stage of the litigation, the limited

evidence in the record—namely, the fact that HKFS and Marnier are direct and bitter

competitors who are vying for the same clients and referral sources, the fact that

Mariner hired Moeschler away from HKFS, the fact that Moeschler contacted HKFS

clients and CPA affiliates shortly after he began working for Mariner,[7] and the fact that

Mariner benefitted directly and substantially from Moeschler's client contacts—support

the inference that Mariner took some action to cause Moeschler's breach.  *Cf. Kallok v.*

*Medtronic, Inc.*, 573 N.W.2d 356, 359, 362 (Minn. 1998) (finding that plaintiff "easily

established" that defendant procured former employee's breach of noncompete even

though breaching employee was first to approach defendant about employment and

defendant did nothing to pressure employee to accept it).  Although the question is

close, the Court finds that HKFS has established "fair ground for litigation" and thus

---

[7]The date that Moeschler accepted employment with Mariner is not in the record, but Moeschler's resignation letter indicates his "intention to affiliate with Mariner," ECF No. 13-1 at 15, and, on the day he resigned, Moeschler filed this lawsuit seeking a declaratory judgment that his employment with Mariner would not violate any of his employment agreements.  ECF No. 1.  Moeschler states that he contacted HKFS's clients and CPA affiliates "[a]fter [he] resigned."  ECF No. 19 ¶¶ 6–7.  The Court infers from these facts that Moeschler made these contacts soon after he accepted employment with Mariner.

has demonstrated a likelihood of success on its tortious-interference claim.  *Watkins*, 346 F.3d at 844.

    In sum, the Court finds that HKFS has established a likelihood of success on its claims that Moeschler breached the EPIAs and that Mariner tortiously interfered with the EPIAs.  But with respect to all of HKFS's other claims—namely, Moeschler's alleged breach of the Agreement Ancillary, Mariner's alleged tortious interference with the Agreement Ancillary, and both Moeschler's and Mariner's alleged misappropriation of trade secrets in violation of Iowa Code §§ 550.1–550.8—HKFS has not established a likelihood of success and therefore is not entitled to a preliminary injunction.

## C.  Irreparable Harm

    "[A] finding of a likelihood of success on the merits only justifies preliminary relief if there is a risk of irreparable harm and the balance of the factors support an injunction."  *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted).  "Failure to show

irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins*, 346 F.3d at 844.

HKFS argues that it has established a threat of irreparable harm because (1) under Minnesota law, irreparable harm may be inferred from the breach of a valid restrictive covenant; (2) the parties contractually stipulated that, in the event of a breach, HKFS would suffer irreparable harm; and (3) HKFS has suffered actual irreparable harm as a result of the actions of Moeschler and Mariner.  The Court disagrees on all three counts.

### 1.  Inference of Irreparable Harm

Citing Minnesota law, HKFS argues that "irreparable harm results and can be inferred from a former employee competing and soliciting customers in breach of a restrictive covenant."  ECF No. 12 at 29.  For several reasons, the Court finds that HKFS's reliance on the inference of irreparable harm created by Minnesota courts is unavailing.

First, Moeschler is not subject to a noncompete agreement and, as explained above, the Court doubts that his nonsolicitation agreement is enforceable.  Thus, the predicate for HKFS's argument—that Moeschler is "competing and soliciting customers in breach of a restrictive covenant"—has not been established.  HKFS *has* established a likelihood of success on its claim that Moeschler breached the EPIAs, but the EPIAs are

-23-

confidentiality agreements, and none of the cases cited by HKFS apply the doctrine of inferred harm to the breach of a confidentiality agreement alone.[8]

Second, and more fundamentally, inferring irreparable harm from the breach of a valid restrictive covenant is a *Minnesota* procedural doctrine developed and applied by *Minnesota* courts in deciding whether to grant injunctive relief under the *Minnesota* Rules of Civil Procedure.[9]  But this case is in federal court, and, as this Court has previously explained, a federal court's authority to issue a preliminary injunction is governed by the *Federal* Rules of Civil Procedure and by *federal* case law construing those rules.  *Fulton*, 2020 WL 7041766, at *11 n.16, 12 & n.18.  That authority can neither be expanded nor contracted by the Minnesota courts.

---

[8]*Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1091–92 (D. Minn. 1981) (inferring irreparable harm from breach of nonsolicitation agreement); *Benfield, Inc. v. Moline*, 351 F. Supp. 2d 911, 918 (D. Minn. 2004) (noting that irreparable harm may be inferred from breach of restrictive covenants, which in this case were nonsolicitation and confidentiality agreements); *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 452–53 (Minn. Ct. App. 2001) (inferring irreparable harm from breach of noncompete agreement).

[9]The two federal cases cited by HKFS in support of the application of this doctrine both cite Minnesota case law.  *See Benfield, Inc. v. Moline*, 351 F. Supp. 2d 911, 918 (D. Minn. 2004) (citing *Advanced Bionics Corp.*, 630 N.W.2d at 452); *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1091 (D. Minn. 1981) (citing *Alside, Inc. v. Larson*, 220 N.W.2d 274, 278 (Minn. 1974); *Eutectic Welding Alloys Corp. v. West*, 160 N.W.2d 566, 569 n.4 (Minn. 1968); and *Cherne Indus. v. Grounds & Assocs.*, 278 N.W.2d 81, 92 (Minn. 1979)). HKFS cites *Medtronic, Inc. v. Gibbons*, 684 F.2d 565 (8th Cir. 1982), for the proposition that this Court is bound by Minnesota law to infer the existence of irreparable harm from the breach of a valid restrictive covenant.  ECF No. 12 at 29–30.  But for the reasons described below, the Court disagrees.

HKFS strenuously argues that state law, rather than federal law, governs the "substantive determination of whether a party has experienced irreparable harm." ECF No. 12 at 28–29. HKFS concedes that federal law supplies the four-part framework for determining whether a preliminary injunction should issue—commonly referred to in the Eighth Circuit as the "*Dataphase* factors." In other words, HKFS agrees that federal law establishes what a movant must show to be entitled to a preliminary injunction— and that, in the Eighth Circuit, federal law dictates that a movant must show (1) a likelihood of success on the merits, (2) a threat of irreparable harm absent a preliminary injunction, (3) that the balance of harms tips in its favor, and (4) that the public interest favors granting an injunction. *Dataphase*, 640 F.2d at 114; ECF No. 12 at 18–19. HKFS argues, however, that while the four-part framework is a matter of federal procedural law, the Court's application of the irreparable-harm prong of this framework is a matter of state substantive law.

The Court disagrees. Federal law supplies not just the four-part *Dataphase* standard but also the content of that standard. Take, for example, the first *Dataphase* factor, requiring the movant to establish a likelihood of success on the merits. Just as federal law dictates that courts must find this factor before issuing a preliminary injunction, so too does federal law dictate how this factor is *applied*—in particular, what a "likelihood of success" *means*. Indeed, HKFS itself cites only federal case law in arguing that the likelihood need not be greater than 50 percent, that the inquiry does

not turn on a mathematical probability of success, that the movant need only show a fair ground for litigation, and that a court should not determine the ultimate outcome of the dispute.[10]  Of course, when the claim arises under state law, the federal court must look at state law to see whether there is a likelihood of success.  But state law does not define what it *means* to establish a likelihood of success.

Similarly, federal law dictates not only that the movant must show irreparable harm, but also dictates how that factor is *applied*—in particular, what a litigant must show to establish "irreparable harm."  And that is true whether the underlying claim arises under federal or state law.

A moment's thought reveals why the law cannot be otherwise.  Suppose, for example, that a state supreme court holds that "a likelihood of success on the merits will be presumed whenever a plaintiff seeks to enforce a restrictive covenant."  Such a holding would relieve the plaintiff of any obligation to establish a likelihood of success in restrictive-covenant cases, essentially eliminating the first *Dataphase* factor.  Or suppose that a state supreme court holds that "irreparable harm will be presumed in

---

[10]ECF No. 12 at 19–20 (citing *PCTV Gold*, 508 F.3d at 1143; *Watkins*, 364 F.3d at 844; *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 n.3 (8th Cir. 1984)); ECF No. 21 at 4–5 (citing *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013); *Corp. Techs. v. Harnett*, 731 F.3d 6, 10–13 (1st Cir. 2013); *Watkins*, 364 F.3d at 844; *Movement Mortg. v. Ward*, No. 3:14-cv-23-RJC-DCK, 2014 WL 880748, at *2 (W.D.N.C. Mar. 6, 2014); *Bos. Sci. Corp. v. Dauberg*, 754 F. Supp. 2d 1033, 1038–39 (D. Minn. 2010); *N. Am. Prod. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1228–29 (M.D. Fla. 2002); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schultz*, No. 01-0402, 2001 WL 1681973, at *2–3 (D.D.C. Feb. 26, 2001)).

any case in which a plaintiff seeks a preliminary injunction."  Such a "presumption"

would entirely eliminate the second *Dataphase* factor.  In short, when federal law

dictates that a likelihood of success and irreparable harm must be established—*actually*

established—a state cannot effectively eliminate those requirements by establishing

"presumptions" that bind a federal court.

     In arguing to the contrary, HKFS relies on *Medtronic, Inc. v. Gibbons*, 684 F.2d 565

(8th Cir. 1982).  HKFS argues that, in *Gibbons*, the Eighth Circuit affirmed the district

court's issuance of a preliminary injunction based on the application of Minnesota case

law creating an inference of harm from the breach of a restrictive covenant.  It is true

that the Eighth Circuit affirmed the district court's ruling in *Gibbons*, and it is true that

*the district court* relied in part on the Minnesota inference in its irreparable-harm

analysis.  *See* 527 F. Supp. 1085, 1090–91 (D. Minn. 1981).  But the Eighth Circuit made

clear that it was affirming *in spite of,* not *because of,* the district court's reliance on the

Minnesota inference.  The Eighth Circuit explained that "the district court did *not*

simply infer irreparable harm from the allegation of Gibbons' breach of a valid and

enforceable restrictive covenant alone" but also made sufficient factual findings to

support the conclusion that Medtronic would suffer *actual* irreparable harm absent a

preliminary injunction.  684 F.2d at 569 (emphasis added).  The Eighth Circuit then

inventoried those factual findings, which included:

> Gibbons' access to confidential information, his employment
> by a competitor of Medtronic in the same sales territory, the
> 'symbiotic relationship' between the sales representative and
> manufacturer in this particular industry, the relationship
> between the sales representative and the customers, the
> substantial investment made by Medtronic in the training of
> its sales representatives, and the substantial assistance given
> by Medtronic to its sales representatives in developing
> information about customers and goodwill.

*Id.* Taken together, the Eighth Circuit concluded that "[t]hese factors support a finding

of irreparable harm." *Id.*

HKFS points out that, immediately following this analysis, the Eighth Circuit

stated the following:

> The possible disclosure or use of confidential information
> such as customer information, *see Davies & Davies Agency v.
> Davies*, 298 N.W.2d 127, 131 (Minn. 1980); *Cherne Industrial,
> Inc. v. Grounds & Assocs.*, 278 N.W.2d [81, 90 (Minn. 1979)], is
> relevant in determining the potential harm to the former
> employer. *See Modern Controls, Inc. v. Andreadakis*, 578 F.2d
> [1264, 1270 (8th Cir. 1978)].

*Id.* HKFS seizes on the Eighth Circuit's citation of two Minnesota cases and argues that,

by citing those cases, the Eighth Circuit was indicating that state rather than federal law

governs the determination of whether a threat of irreparable harm has been established.

But HKFS reads far too much into this passage.

First, the paragraph on which HKFS relies *begins* by refusing to endorse the

notion that state law governs the irreparable-harm analysis.[11]  Gibbons argued on

appeal that the district court "improperly inferred irreparable harm."  *Id.*  If state law

governed, then the Eighth Circuit could have simply affirmed on the basis that

Minnesota law created an inference of irreparable harm and the district court was

required to apply that inference.  The Eighth Circuit said no such thing.  Instead, the

Eighth Circuit affirmed because the district court did *not* rely exclusively on the

inference but instead made factual findings sufficient to support a finding of

actual—not inferred—irreparable harm.  True, at the conclusion of the same paragraph,

the Eighth Circuit cited two Minnesota cases (along with a federal case) in support of

the common-sense observation that "[t]he possible disclosure or use of confidential

information such as customer information is relevant in determining" whether actual,

irreparable harm is threatened.  *Id.* at 569 (citations omitted).  But nothing in *Gibbons*

suggests that the Eighth Circuit was treating the Minnesota cases as binding authority.

Courts commonly cite nonbinding cases that they find persuasive.

Second, if (as HKFS argues) *Gibbons*'s citation to two Minnesota cases in the

course of its irreparable-harm analysis establishes that state law governs the analysis,

---

[11]*Cf. Novus Franchising v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (rejecting
plaintiff's argument that lower court abused its discretion in declining to infer
irreparable harm and holding that denial of preliminary injunction was not an abuse of
discretion in light of (1) the plaintiff's delay in seeking a preliminary injunction and
(2) the lack of evidence that the alleged harm was "truly 'irreparable'").

then someone needs to tell the Eighth Circuit.  In the 40 years since *Gibbons* was

decided, the Eighth Circuit has applied and elaborated upon the irreparable-harm factor

in countless cases in which the underlying cause of action arose under state law.  The

Eighth Circuit has almost always cited exclusively federal law (which HKFS says is

irrelevant) and has almost never cited state law (which HKFS says is controlling).[12]

For these reasons, the Court rejects the notion that *Gibbons* establishes that state

law governs the irreparable-harm inquiry.  Moreover, although the Eighth Circuit has

not explicitly addressed this issue in *Gibbons* or any other case, a clear majority of

federal courts that have explicitly addressed this issue have held that federal law

controls.[13]  For example, in *Viad Corp. v. Cordial*, 299 F. Supp. 2d 466, 481 (W.D. Pa. 2003),

---

[12]*See, e.g.*, *Jet Midwest Int'l Co. v. Jet Midwest Grp.*, 953 F.3d 1041, 1046 (8th Cir. 2020); *Novus Franchising v. Dawson*, 725 F.3d 885, 893–95 (8th Cir. 2013) (considering parties' state-law-based arguments as to irreparable harm before affirming district court's finding based exclusively on federal case law); *CDI Energy Servs.*, 567 F.3d at 403; *Gen. Motors Corp.*, 563 F.3d at 318–20; *Mid-Am. Real Est. Co. v. Iowa Realty Co.*, 406 F.3d 969, 977 (8th Cir. 2005); *Watkins*, 346 F.3d at 844.

[13]*See, e.g.*, *Tri-State Grease & Tallow Co., Inc. v. Milk Specialties Co.*, No. 11-CV-0709 (RHK/JSM), 2011 WL 1561674, at *6 (D. Minn. Apr. 22, 2011) ("[Plaintiff] points to Illinois caselaw supposedly standing for the proposition that the 'risk of losing customer accounts and sales is irreparable harm justifying an emergency injunction.' But even in diversity cases such as this, whether to grant a preliminary injunction is determined using federal rather than state standards." (citation omitted)); *Arthur J. Gallagher Serv. Co. v. Egan*, No. 12-80361-Civ-Ryskamp/Hopkins, 2012 WL 12839373, at *9–10 & n.7 (S.D. Fla. June 29), *report & recommendation adopted*, 2012 WL 12838463 (S.D. Fla. Aug. 15, 2012), *aff'd*, 514 F. App'x 839 (11th Cir. 2013); *S. Wine & Spirits of Am., Inc. v. Simpkins*, No. 10-21136-Civ, 2011 WL 124631, at *8 (S.D. Fla. Jan. 14, 2011); *England v. USA Fed. Credit Union*, No. 6:08-cv-326-Orl-19GJK, 2008 WL 660294, at *2 (M.D. Fla.

(continued...)

the plaintiff corporation argued that, under Pennsylvania law, the potential loss of

customers caused by the defendant's breach of a restrictive covenant was "sufficient to

prove irreparable harm."  But, as Judge Hardiman explained:

> [A]lthough the enforceability of a restrictive employment
> covenant is governed by Pennsylvania substantive law,
> federal law governs the standards for injunctive relief,
> including the irreparable harm requirement.  *Instant Air
> Freight Co.* [*v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir.
> 1989)].  Viad has cited no case from the Court of Appeals for
> the Third Circuit—and the Court is unaware of such
> authority—which holds that breach of a restrictive covenant
> is *prima facie* evidence of irreparable harm.

*Id.*

The Sixth Circuit reached the same conclusion twelve years earlier in *Southern

Milk Sales, Inc. v. Martin*, 924 F.2d 98 (6th Cir. 1991), analyzing the question under *Erie

Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).  The plaintiff in that case argued that,

pursuant to a Michigan statute, "the only prerequisite for issuing a preliminary

---

[13](...continued)
Mar. 6, 2008); *Budget Rent A Car Corp. v. Harvey Kidd Auto.*, 249 F. Supp. 2d 1048, 1049–50 (N.D. Ill. 2003) ("Budget argues . . . that Illinois law presumes irreparable injury once a protectable interest is established.  While Illinois law is relevant to determining the likelihood of Budget's success on the merits . . . , '[t]he propriety of [the issuance of] a preliminary injunction, of course, is to be determined by the rules and decisions of federal courts.'" (second-to-last alteration in original) (quoting *Gen. Elec. Co. v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956))); *Seda Specialty Packing Corp. v. Am. Safety Closure Corp.*, No. 95 Civ. 4745 (LMM), 1995 WL 404821, at *2 (S.D.N.Y. July 7, 1995); David E. Shipley, *The Preliminary Injunction Standard in Diversity: A Typical Unguided* Erie *Choice*, 50 Ga. L. Rev. 1169, 1203–09 (2016).  *But see Genovese Drug Stores, Inc. v. Bercrose Assocs.*, 563 F. Supp. 1299, 1304 (D. Conn. 1983), *vacated on other grounds sub nom. Genovese Drug Stores, Inc. v. Conn. Packing Co.*, 732 F.2d 286, 288 & n.1 (2d Cir. 1984).

injunction" is a showing that the statute has been violated.  *Id.* at 102.[14]  The court

disagreed and affirmed the district court's denial of a preliminary injunction because

the plaintiff had not established a threat of irreparable harm.  In reaching this

conclusion, the court noted that, while state law governs substantive issues, federal law

governs procedural issues.  Because "the purpose of a preliminary injunction, in

contrast to one that is final, 'is merely to preserve the relative positions of the parties

until a trial on the merits can be held,'" the court concluded that "the issue in question

is procedural." *Id.* (citation omitted).[15]  The issuance of a preliminary injunction does

not, as a formal matter, bear on the ultimate outcome of the case but merely preserves

the status quo pending a final resolution of the parties' claims.  Accordingly, the Sixth

---

[14]This is a real-life example of how deferring to state law would allow states to
eliminate the *Dataphase* factors.  HKFS cannot reconcile its position that federal law
establishes the factors that a federal court must consider in deciding whether to grant a
motion for a preliminary injunction with its position that state law may eliminate some
or all of those factors either expressly or by establishing "presumptions."

[15]*See also Cap. Tool & Mfg. Co. v. Maschinenfabrik Herkules*, 837 F.2d 171, 172–73
(4th Cir. 1988) (applying federal case law construing availability of preliminary
injunction rather than state statute providing for injunction in absence of irreparable
harm because "the purpose of a preliminary, as opposed to a final, injunction 'is merely
to preserve the relative positions of the parties until a trial on the merits can be held,'"
(citation omitted)); 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2943
(3d ed. 2021) ("Orders under Rule 65(a) . . . are not final awards in any sense; they do
not really compensate plaintiff or rectify the grievance and, because of their limited
duration, do not permanently proscribe defendant's freedom of action.  Because [it]
only afford[s] temporary relief, there is little chance that the entry of an order under
Rule 65(a) . . . ultimately will interfere seriously with the goals or policies of the
state-created right that is being litigated and will be adjudicated in accordance with
state substantive law.").

Circuit held that federal case law—not a Michigan statute addressing the availability of injunctive relief in Michigan courts—governed the application of Rule 65 in federal courts.[16]

In sum, the Minnesota presumption—which excuses plaintiffs from showing *actual* irreparable harm, as *Dataphase* and a legion of other Eighth Circuit decisions require—does not apply in federal court.

### 2.  Contractual Stipulation

HKFS also argues that, because the parties stipulated in their contract that, if the contract was breached, HKFS would suffer irreparable harm, HKFS need not establish that it is actually threatened with irreparable harm.  The Court disagrees for two reasons:

First, while the Agreement Ancillary provides that a violation of the agreement would result in "immediate and irreparable injury" entitling HKFS to injunctive relief, the EPIAs include no such language.  *Compare* ECF No. 1-1 at 2 *with* ECF Nos. 1-2, 1-3. The Court has found a likelihood of success only with respect to HKFS's claim that the

---

[16]Some courts have resolved this question under the framework set out in *Hanna v. Plumer*, 380 U.S. 460 (1965), for analyzing when a Federal Rule of Civil Procedure must yield to a conflicting state law.  In *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1448–49 (11th Cir. 1991), for example, the Eleventh Circuit addressed whether federal or state standards applied to the irreparable-harm inquiry.  The court concluded that "federal procedural standards have been codified by reference in Rule 65 of the Federal Rules of Civil Procedure," that Rule 65 "is both constitutional and within the scope of the rules' enabling act," and that the federal standard therefore applied.  *Id*. at 1448.

EPIAs were breached, not with respect to HKFS's claim that the Agreement Ancillary was breached.  Hence, the stipulation in the Agreement Ancillary does not help HKFS.

Second, even if the EPIAs contained a similar stipulation, that stipulation would not bind this Court.  *See Fulton*, 2020 WL 7041766, at *11 & nn.15, 16 (collecting cases). Again, federal law requires a party who seeks a preliminary injunction to show irreparable harm—*actual* irreparable harm.  A stipulation may be evidence of whether irreparable harm exists, but a stipulation cannot eliminate the need to establish irreparable harm.  *Id.* at *11.  If a movant will not, in fact, suffer irreparable harm, then the movant is not entitled to a preliminary injunction, no matter what any contractual stipulation may say about irreparable harm.[17]

### 3.  Actual Irreparable Harm

Having failed in its effort to be excused from showing actual irreparable harm by taking advantage of the Minnesota inference or the contractual stipulation, HKFS finally argues that it will, in fact, suffer actual irreparable harm in the absence of a preliminary injunction because the "exodus" of HKFS employees to Mariner has made its remaining clients wary of using HKFS to manage their wealth.  ECF No. 12 at 18.  According to

---

[17]HKFS argues that Iowa courts rely on such stipulations in issuing preliminary injunctions.  That is irrelevant, however, because as this Court has explained at length, neither Iowa law nor the law of any other state controls this issue of federal procedural law.

HKFS, this loss of confidence is particularly problematic given the great trust that a client must place in her financial manager.

HKFS's argument has an obvious flaw.  The harm that HKFS identifies is caused by the fact that Moeschler and other HKFS employees left the company and went to work for Mariner.  But HKFS never required Moeschler to sign a noncompete agreement; he has every right to work for Mariner.  Any preliminary injunction that this Court might issue would enforce the terms of the EPIAs—the only agreements that Moeschler has likely violated—and thus such an injunction would not keep Moeschler or anyone else from leaving HKFS and working for Mariner.  The "exodus" would continue.[18]

HKFS also argues that it faces a threat of irreparable harm based on the loss or threatened loss of clients, CPA affiliates, and goodwill.  In particular, HKFS argues that it will suffer irreparable harm due to "Moeschler's use of HKFS's trade secrets and confidential information, including confidential client and pricing information, to solicit HKFS's customers."  ECF No. 12 at 30.  But, for the same reasons described by this Court in *Fulton*, the threatened loss of clients is not "irreparable" because the lost business can be remedied with money damages.  2020 WL 7041766, at *8–9.  Similarly,

---

[18]It also seems farfetched that the confidence of HKFS clients—which has supposedly been shaken by the exodus of a few HKFS employees to Mariner—would somehow be restored by an injunction prohibiting the departed employees from working for Mariner.  The departed employees would still be departed employees.

the threatened loss of CPA referral sources is compensable with money damages, and

the threatened loss of goodwill is, on these facts, too speculative to support a

preliminary injunction. *See id.* at *9–11. This is a case between two commercial entities

about lost profits; money will repair any damage that Moeschler and Mariner have

caused to HKFS.

For these reasons, the Court finds that HKFS has failed to establish that it will

suffer irreparable harm in the absence of a preliminary injunction.[19]

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT the motion of defendants/third-party plaintiffs/

counter-claimants Honkamp Krueger Financial Services, Inc., and BCOR

Administrative Services, LLC, for a preliminary injunction [ECF No. 10] is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  September 21, 2021              s/Patrick J. Schiltz
                                       Patrick J. Schiltz
                                       United States District Judge

---

[19]The Court finds that the remaining *Dataphase* factors—the balance of harms and the public interest—do not strongly favor either side.